IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Francisco González as a beneficiary of the Royalty Fund Mechanized Cargo Local 1575; Francisco González and Rafael Cuevas Kuinlam in their capacity as Trustees and Fiduciaries of the Royalty Fund Mechanized Cargo Local 1575, a Welfare Fund,<br><br>Plaintiff,<br><br>v.<br><br>UBS Financial Services Incorporated of Puerto Rico,<br><br>Defendant. | Civil No.:<br><br>RE: ERISA, Breach of Fiduciary Duties |

**C O M P L A I N T**

**COME NOW** the Plaintiffs, Francisco González as a beneficiary and the Royalty Fund Mechanized Cargo Local 1575 represented by its Trustees, through the undersigned legal representation and most respectfully **STATE** and **PRAY** as follows:

**I. SUMMARY OF THE ACTION**

This action arises out of the misconduct of the named Defendant that owed the Plaintiffs – a beneficiary of the Fund and a Labor-Management Relations Act / ERISA welfare fund – the highest standard of fiduciary duty. In violation of that duty, Defendant failed to conduct a prudent and loyal investigation regarding the investment alternatives for the Fund's monies and caused or allowed that practically all of the Plan's assets under its care be solely invested in one high-risk, highly concentrated, leveraged and volatile Puerto Rico closed-end fund which ultimately and in effect wiped out all of the invested

1

money. Defendant did so and/or allowed this to happen for its own interest without any regard to the best interest of the beneficiaries. Moreover, for its own benefit, Defendant year after year failed to monitor the investment and remove it as imprudent, allowing it to continue ultimately compounding the damages suffered.

In the end, because of Defendant's misconduct, the Royalty Fund is unable to use these funds for their intended purpose: to pay benefits to hundreds of longshore workers that have been displaced in their employment.

The current fiduciaries of the Royalty Fund as well as a beneficiary, therefore, bring this action to make good to the plan all the losses resulting from defendant's breach of fiduciary duty, and for any other equitable and remedial relief as the court may deem appropriate.

## II. JURISDICTION AND VENUE

1. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that a beneficiary or a fiduciary in a plan covered by the Employee Retirement Income Security Act of 1974 (after this "ERISA") may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

2. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

3. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of

fiduciary duties giving rise to this action occurred, and where the Defendant may be found.

### III. THE PARTIES

4. The Royalty Fund Mechanized Cargo Local 1575 of the International Longshoremen Association (after this "the Royalty Fund") is a §302 of the Labor-Management Relations Act Fund created in 1976, for the purpose of receiving contributions from employers to provide welfare benefits to longshore workers in Puerto Rico affiliated to the International Longshoremen Association Local 1575.

5. As such, the Royalty Fund is a welfare fund, and accordingly, an employee benefit plan or a plan as defined under the Employee Retirement Income Security Act of 1974, §3(3), 29 U.S.C. §1002(3), under the purview of the Employee Benefits Security Administration of the U.S. Department of Labor.

6. The Royalty Fund is the current holder of 108,827 shares of the PR Investors Bond Fund I for which a total of $838,397.22 were paid that were previously held in UBS Financial Services Incorporated of Puerto Rico Account 1G 10057, as more fully explained below.

7. By reason of his employment in covered-work with a contributing employer, Mr. Francisco González is a beneficiary of the Royalty Fund. Mr. González is also the current Employee Trustee to the Royalty Fund Mechanized Cargo.

8. Since the time he became an Employee Trustee, Francisco Gonzalez has been a fiduciary to the Royalty Fund pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii).

9. Rafael Cuevas Kuinlam is the current Employer Trustee to the Royalty Fund.

3

10. Since the time he became an Employee Trustee, Rafael Cuevas Kuinlam has been a fiduciary to the Royalty Fund pursuant to 29 U.S.C. § 10022(21)(A)(i) and (iii).

11. UBS Financial Services Incorporated of Puerto Rico (after this "UBSPR") is a financial services provider incorporated under the laws of the Commonwealth of Puerto Rico, and has its principal offices in San Juan Puerto Rico.

## IV. FACTUAL BACKGROUND

*A.   The Account and the defendant's role as to the same*

12. On April 15, 2009, the Royalty Fund authorized the transfer of $646,217.40 of its funds to a sister trust, the ILA-PRSSA Welfare Fund, for custody.

13. The above mentioned funds were Royalty Fund's plan assets by virtue of the fact that they were contributed to the Royalty Fund by contributing employers to provide benefits to the Royalty Fund's participants and held in trust for said purposes.

14. On occasion of the transfer of custody, the ILA-PRSSA Welfare Fund proceeded to open Account Number 1G 10057 (the Account) with UBSPR. The Account remained open until April 25, 2018, at which time the Royalty Fund regained custody of the funds and transferred all and any fund and/or remaining security to a different financial institution.

15. The application form for the Account indicated that the funds were to be held by an ERISA Plan.

16. UBSPR was further informed that the funds were to be invested in ways that sought potential returns ***with a lower risk of loss of principal***.

17. Shortly after opening the Account, by mutual understanding, UBSPR assumed roles far exceeding the traditional broker/dealer relationship, clearly becoming

4

investment advisors to the Account, in addition to assuming control in respect to the management and disposition of the Plan's assets in the Account.

18. UBSPR charged and collected commissions and fees in exchange of its services.

19. The Account was assigned several Financial Advisor[s]. The majority of these Financial Advisors were appointed by UBSPR and were assigned so that the Account could receive services based on its particular need as well as personalized advise.

20. UBSPR through its Financial Advisors provided advice on a regular basis. In fact, throughout the time the Account was held by UBSPR, its Financial Advisors had periodic performance meetings with the holder of the Account for said purposes something that a broker/dealer simply does not do.

21. The advice provided by UBSPR through its Financial Advisors related to the advisability of investing in and purchasing securities, which, in relation to the Account, was the sole basis for any investment decision.

22. In addition, and in any case, UBSPR through its Financial Advisors in effect exercised control over the disposition of the Plan's assets in the Account by, among other things – as more fully explained below: causing that 68,867 shares of the PR Fixed Income Fund V held in the account be sold and buying ***on the same day***, 71,037 shares of the PR Investor Bond Fund I; by causing that all dividends of the investment be reinvested in further shares of the Fund resulting in an additional purchase of 37,790 shares of the Puerto Rico Investors Bond Fund I; and deciding in what account to invest the cash balances portion of the monies held in the account.

*B.     The defendant's conduct*

23.     On August 19, 2009 UBSPR through its Financial Advisor caused that 68,867 shares of the PR Fixed Income Fund V held in the Account be sold in the amount of $603,269.67.

24.     On that very same day, UBSPR through its representatives used the funds in the Account to buy 71,037 shares of the PR Investor Bond Fund I for the total amount of $603,109.38.

25.     Through the above described transactions, UBS through its representatives disposed of (in the case of the sale) and invested (in the case of the purchase) practically the entire amount of the Plan's assets in the Account.[1]

26.     The purchase of the 71,037 shares of the PR Investor Bond Fund I meant that almost the entire amount of funds in the Account was placed in only one investment.

27.     The PR Investor Bond Fund I is a closed-end Fund.

28.     The closed-end Fund in which defendant placed the **_sole_** investment of the Account is a non-diversified fund with two-thirds of its holdings in Puerto Rico assets of only few issuers.

29.     The closed-end Fund in which defendant placed the **_sole_** investment of the Account is exempted from the Investment Company Act of 1940 (the 1940 Act), including from those provisions regarding conflict of interest involving mutual funds transactions as well as the restrictions regarding the permitted level of leverage.

30.     UBSPR, through itself or several of its affiliates or parent companies, had and has several roles in relation to the closed-end Fund in which Respondent placed the **_sole_** investment in the Account that would not have been permitted under the 1940 Act.

---

1   The balance represented the amount of cash balance.

6

For example, UBSPR, through itself or several of its affiliates or parent companies, served as: i. underwriters for a significant portion of the bonds issued by the Commonwealth of Puerto Rico and its instrumentalities held by the closed-end Fund, as well as ii. co-Investment Advisor to the very same Fund that was buying these bonds.

31. The closed-end Fund in which Defendant placed the ***sole*** investment of the Account was leveraged in ways not allowed by the 1940 Act, which in effect doubles the risk of loss. While the 1940 Act generally requires funds to have 300% asset coverage, the closed-end Fund here in question can barrow one dollar for every dollar of capital, allowing for a maximum level of leverage of 50% in relation to total assets.

32. The closed-end Fund in which Respondent placed the ***sole*** investment of the Account was not exchange-traded, but rather UBSPR was either the only secondary market dealer or the dominant dealer of the same.

33. Investing the Plan's assets in shares of this closed-end Fund generated for UBSPR a considerable higher commission than that which would have generated an investment in a regular type of equity security. An investment in 71,037 shares of a regular equity security, for example, would have generated $0.10 per share plus $655.00 in commissions for a total amount of $7,758.70, while the purchase of the 71,037 shares of the PR Investor Bond Fund I generated for UBSPR $0.28 per share in commissions, for a total amount of $19,890.36.

34. USBPR through its representatives either carried-out the purchase of the above described securities using the Plan's assets on their own and informed of such transaction afterward, or advised specifically that said investment should be made and said advise was the sole basis for the purchase.

7

35. After having placed $603,109.38 of the Plan's asset in only one investment and without prior verbal or written consent, UBSPR through its representatives caused the dividends of this investment to be reinvested in the very same security. In total, through this scheme, an additional 37,790 shares of the Puerto Rico Investors Bond Fund I were acquired with Plan's assets at an additional cost of $235,287.84, making the Royalty Fund's total holding of said security to be 108,827 shares representing a total investment in the security of $838,397.22. The last of these repurchases took place in September 2014.

36. Neither UBSPR nor any of its representatives conducted an investigation, thorough or otherwise, prior to making the above described investments to determine the merit of the investment; for example, and among other factors, Defendant failed to conduct an investigation as to how, if in any way, the conflicting interests and/or roles it had, either by itself or on account of several of its parent, affiliates or sister companies, in relation to the closed-end Fund in which it placed the ***sole*** investment of the Account, that allowed it to generate a great deal more commissions than it would have if the funds were placed in other types of investment benefited the beneficiaries of the Plan's assets as compared to other investment alternatives.

37. Neither UBSPR nor any of its representatives conducted an investigation, thorough or otherwise, prior to making the above described investments to determine how the multiplying effect that the leverage level of the closed-end Fund in which it placed the ***sole*** investment of the Account had on potential losses benefited the beneficiaries of the Plan's assets in comparison to other investment alternatives; among other factors.

38. Neither UBSPR nor any of its representatives conducted an investigation, thorough or otherwise, prior to making the above described investments to determine how

the facts that regular uncontrolled market forces such as supply and demand did not determine the market price of the securities in which it placed the _**sole**_ investment of the Account or that the liquidity of these securities substantially depended on Defendant's own willingness to continue to buy, sell or keep an inventory of these securities benefited the beneficiaries of the Plan's assets in comparison to other investment alternatives; among other factors.

39. At the present time and because of all of the above, Plaintiffs hold a total of 108,827 shares in the closed-end Fund, for which it paid a total of $838,397.22, or an average of $7.703 per share. Although at this time, the shares are valued at $2.14, the reality is that there is no market to sell these shares even at this substantial loss.

40. Because of the above, the Royalty Fund's funds are at this time tied in an investment vehicle that has no market to trade and that has accordingly lost all the real value of the investment as well as the potential growth and income that would have been generated on said investment if the money had been properly placed.

41. For these reasons, the Royalty Fund is currently unable to use these funds to pay the benefits for which these monies were held at a time that hundreds of its participants have been displaced in their employments.

42. At no time while the Plan's asset and/or the investment in the PR Investors Bond Fund I were held by UBSPR did defendant or any of its representatives remove, sell or recommended that said investment be removed or sold.

43. UBSPR also decided to change the way in which available cash balances in the Account were invested, choosing through UBS Liquid Assets Government Fund.

9

44. By choosing on its own where to invest the available cash balances of the Account, UBSPR exercised further discretionary control respecting the management and/or disposition of the Plan's assets in the Account.

## V. ERISA FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS

45. ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of ERISA benefit plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and . . .."

46. These ERISA fiduciary duties are the highest known to the law. *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

47. The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants, *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000), "exclud[ing] all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries . . .." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

10

48. The duty of prudence as it relates to investments is twofold: a fiduciary not only has a duty to select prudent investments but also "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

49. In considering whether a fiduciary discharged this duty of prudence, "the thoroughness of the investigation into the merits of the transaction" is a dispositive consideration. *Bunch v. W.R. Grace & Co.,* 532 F. Supp. 2d 283, 288 (D. Mass. 2008). Consequently, a breach of the duty of prudence "hinge[s] on infirmities in the selection process for investment" and a failure to investigate alternatives. *Tibble v. Edison Int'l*, 729 F.3d 1110, 1121 (9th Cir. 2013), vacated on other grounds, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015).

### VI. COUNT I
### Breach of Duties of Loyalty and Prudence in selecting investment
### 29 U.S.C. § 1104(a)

50. Defendant UBSPR, is or was a fiduciary in relation to the Plan's assets in the Account under 29 U.S.C. §§ 1002(21).

51. 29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon the Defendant in its selection of investments using Plan's assets.

52. The scope of the fiduciary duties and responsibilities of the Defendant included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA. The Defendant had an obligation to conduct a thorough investigation regarding the merits of the investment to ensure that the Plan's assets are invested prudently.

11

53. As described throughout this Complaint, the Defendant failed to employ a prudent and loyal process – not tainted by self-interest- for selecting the investment in which it placed practically the whole amount of Plan's Assets in the Account.

54. A prudent and loyal fiduciary, after conducting a thorough investigation as to the merits of the investment, would not have invested the Plan's assets in the PR Investor Bond Fund I.

55. Each of the above-mentioned actions and failures described throughout the Complaint demonstrate Defendant's failure to make Plan investment decisions or to offer advise as to them based solely on the merits of said investment in the interest of Plan participants. These failures were intentional. Defendant's conduct and decisions were driven by their desire to drive revenues and profits and to generally promote UBSPR and its affiliates business interests. Through these actions and omissions, the Defendant failed to discharge its duties with respect to these particular Plan's Assets solely in the interest of the participants and beneficiaries of the Royalty Fund, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

56. Each of the above actions and omissions described in this Complaint demonstrate that the Defendant failed to discharge their duties with respect to the Plan's assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

57. The date of the last action which constituted a part of the above described breach of fiduciary duty was September 2014, the date in which the last shares of the PR Investors Bond Fund I were bought with Plan's assets, and therefore this action is brought within six (6) years thereafter.

## VII. COUNT II
### Breach of Duties of Loyalty and Prudence in monitoring the investment
### 29 U.S.C. § 1104(a)

58. In any case, pursuant to 29 U.S.C. § 1104 the Defendant had a continuing duty to monitor the investment made with the Plan's assets and remove the imprudent ones that exists separate and apart from the duty to exercise prudence in selecting investments.

59. As described throughout this Complaint, the Defendant sat by idly and failed to monitor the investment of the Plan's assets in the PR Investors Bond Fund I on an ongoing basis, and to take all necessary steps to ensure that the Plan's assets were invested prudently.

60. If Defendant would have employed a prudent and loyal process for monitoring the investment and its investment alternatives, it would have removed or recommended that the investment in the PR Investors Bond Fund I be removed as structurally unsuitable or imprudent.

61. Rather than fulfilling its duty to monitor the investment and remove or recommend that imprudent ones be removed, Defendant caused or permitted that the Plan's assets continued to be invested in the PR Investors Bond Fund I shares.

62. A prudent fiduciary would had removed or recommended that the Investment in the PR Investor Bond Fund I be removed as imprudent.

63. The above-mentioned omissions described throughout the Complaint demonstrate Defendant's failure to monitor Plan's investment or advise as to them based solely on the merits of said investment in the interest of Plan's participants. These failures were flagrant intentional. Defendant's conduct and omissions were driven by its desire to drive revenues and profits and to generally promote UBSPR and its affiliates business interests. Through these actions and omissions, the Defendant failed to discharge its duties with respect to these particular Plan's Assets solely in the interest of the participants and beneficiaries of the Royalty Fund, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) and (B).

65. This breach of fiduciary duty continued while the Defendant held the Plan's assets, and/or the Defendant could have cured this breach while it held the Plan's assets. Since the Plan's assets were transferred out of UBSPR on April 25, 2018 and all relationship with Defendant severed as of that date, this action is brought within six (6) years thereafter.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A. A declaration that the Defendant breached its fiduciary duties under ERISA;

B. An order compelling Defendant to personally make good to the Royalty Fund all losses that the Plan incurred as a result of the breaches of fiduciary duties, including the return on investment that the Plan's Assets would have earned had they been invested prudently.

C. An accounting for profits earned by Defendant and a subsequent order requiring it to disgorge all profits received from, or in respect of, the investments made on account of the Plan's assets in the Account;

D. An award of pre-judgment interest;

E. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

F. An award of such other and further relief as the Court deems equitable an just.

In San Juan, Puerto Rico this ___ day of January of 2019.

ATTORNEYS FOR PLAINTIFFS:

 /s/ Antonio Cuevas Delgado
ANTONIO CUEVAS DELGADO
USDC No. 208014
Email: acuevas@ckblawpr.com
**CUEVAS KUINLAM, MARQUEZ & O'NEILL**
416 Escorial Avenue
Caparra Heights
San Juan, Puerto Rico 00920
Tel. 787- 985-9164